**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| BRETT WIATER<br>Birmingham, MI 48009<br>On behalf of himself<br>and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>STELLANTIS, N.V. and FCA US LLC<br><br>Defendants. | Demand for Jury Trial<br><br>Case No. 2:26-cv-10259-SKD-EAS<br><br>FIRST AMENDED COMPLAINT – CLASS ACTION |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, Dr. Brett Wiater, individually and on behalf of all other persons similarly situated, for his first amended complaint for damages against Defendants, Stellantis, N.V.("Stellantis") and FCA US LLC ("FCA") (collectively "Defendants").

**PARTIES**

1. Plaintiff is a resident and citizen of the state of Michigan. Plaintiff resides in Oakland County, in the Eastern District of Michigan.

2. On information and belief, Stellantis is engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or selling, either directly or indirectly, through third parties and/or related entities, the Class Vehicles in the United States of America.

3. On information and belief, FCA is a corporation duly organized and existing under the laws of the state of Delaware and duly authorized to conduct business in the State of Michigan.

4. On information and belief, FCA maintains its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

5. FCA is engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or selling, either directly or indirectly, through third parties and/or related entities, the Class Vehicles.

**NATURE OF ACTION**

6. Over fifty years ago, the U.S. Department of Transportation ("DOT") recognized that "stolen cars constitute a major hazard to life and limb… [and] cause unreasonable risk of accident, personal injury, and death[.]" 33 Fed. Reg. 6,471 (Apr. 27, 1968). In recognition of the safety risk caused by auto thefts, Federal Motor Vehicle Safety Standards ("FMVSS" or "Safety Standards") were promulgated. The National Highway Traffic Safety Administration ("NHTSA") concluded that, "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety." *Id.*

7. One of the most fundamental Safety Standards is FMVSS No. 114, titled "Theft Protection and rollaway prevention," which requires manufacturers to install in each of their vehicles "a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self–mobility, of the vehicle, or both." 49 C.F.R. § 571.114 S5.1.1.

8. In 2006, NHTSA iterated that its "safety standard on theft protection [FMVSS No. 114] specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles." See 71 Fed. Reg. 17,752 (Apr. 7, 2006). NHTSA goes on to make clear that "the standard sought to ensure that the vehicle could not be easily operated with the key" and that "thieves… could [not] bypass the ignition lock." *Id.* at 17,752-53.

9. This action concerns a material safety defect in tens of thousands of Dodge models manufactured by Stellantis and FCA from 2019 to 2023 that utilize keyless entry to lock, unlock, and/or start the vehicle (the "Class Vehicles") all of which have a hackable key fob system (the "Theft Prone Defect" or "Defect"), and therefore, an owner of any one of them may bring a class action on behalf of the entire class. Plaintiff brings this action individually and on behalf of National Class, for the benefit and protection of owners and lessees of the Class Vehicles. The Class Vehicles made the subject of this suit, which are manufactured, designed, produced, distributed, and sold by Defendants, are easy to steal, unsafe, and worth less than they would be, if they were not defective.

10. During the relevant class period, Defendants manufactured, designed, and put into the stream of commerce the Class Vehicles.

11. Upon information and belief, every Class Vehicle sold between 2019 and 2023 that utilizes keyless car entry technology was designed with hackable key fob technology.

12. Keyless car technology works by transmitting low-frequency signals between a keyless electronic fob and the vehicle's computer.

13. The signal enables keyless entry utilizing a key fob or smart key for unlocking and locking the vehicle doors and in some cases, starting the ignition.

14. Keyless car theft, also called "relay car theft," occurs when an individual hacks into the car's signal through its corresponding key fob.

15. The key fob's unique code is transmitted into the cloning device and subsequently used to deceive the car into thinking the authentic key fob is nearby. Then, because the vehicle mistakenly registers that the authentic key is near, the vehicle unlocks, and the engine can be started, all without activating the alarm system.

16. The key fob, and its code, are an essential component of the Class Vehicles as these are the primary means of access and operation of the vehicle. Intercepting the code grants hackers the ability to gain access into the vehicle, start the ignition, and drive away with the vehicle.

17. Key fob signal interception and cloning devices are readily available for purchase at relatively low costs on platforms such as Amazon, eBay, and other online stores. These devices may be as compact as the average smart phone. See **Exhibit 1** - "Just a Pair of These $11 Radio Gadgets Can Steal a Car," WIRED (Apr. 24, 2017) located at https://www.wired.com/2017/04/just-pair-11-radio-gadgets-can-steal-car/; see also **Exhibit 2** - "Meet the Guy Selling Wireless Tech to Steal Luxury Cars in Seconds," VICE (Feb. 11, 2020), located at https://www.vice.com/en/article/guy-selling-relay-attack-keyless-repeaters-to-steal-cars/.

18. Within a matter of 20-30 seconds, the intercepted signal can be utilized to unlock the vehicle and start the ignition. *Id.*

19. The Class Vehicles also contain a defective OBDII port that, in addition to the hackable key fob system, makes these cars a favorite of thieves across the country who can steal the car in under a few minutes. Thieves can easily access the OBDII port and connect a handheld device purchased online to tap into the car's computer system, program a new key fob, and drive off.

20. This key signal interception and replication technique has led to an influx of tutorial videos and tips across the internet that provide easy to follow directions on how to successfully utilize this method to steal cars such as the Class Vehicles.

21. The Class Vehicles do not comply with this FMVSS 114 in that when the key is removed from the starting system, neither steering nor forward self-mobility is prevented. If it were, the Class Vehicles would not be stolen at alarming rates.

22. FMVSS 114, S.5.1.1 requires:

> Each vehicle must have a starting system which, whenever the key is removed from the starting system, prevents:
>
> (a) The normal activation of the vehicle's engine or motor; and
>
> (b) Either steering, or forward self-mobility, of the vehicle, or both.

23. FMVSS No. 114 is a "self-certification" process. In other words, NHTSA does not issue type approval certification and does not certify any motor vehicles or motor vehicle equipment as complying with applicable FMVSS.

24. Although Defendants knew the Class Vehicles did not comply with FMVSS No. 114, Defendants, as part of the FMVS No. 114 "self-certification" process, affixed to each Class Vehicle label or tag certifying that the vehicle "complies with applicable motor vehicle safety standards" and "this vehicle conforms to all applicable U.S.A. federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture…" ("FMVS No.114 Certification").

25. Since at least 2019, Defendants have sold and leased, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles with the FMVS No.114 Certification in Michigan and nationwide.

26. Defendants did so without disclosing the fact that the Class Vehicles had a defect which made them easy to steal, unsafe, and worth less than they should be, if they did not have the defect.

27. The ease and success of key fob attacks have also led to a dramatic rise in the theft of Class Vehicles since 2017.

28. The National Insurance Crime Bureau ("NICB") in its 2017 "Hot Wheels" report ranked Dodge Ram Pickup full-size pickups as the eighth most stolen vehicle with 12,004 total model thefts. See **Exhibit 3** – NICB Hot Wheels Report (2017).

29. In 2018, the NICB ranked Dodge Ram full-size pickups as the ninth most stolen vehicles. See **Exhibit 4** – NICB Hot Wheels Report (2018).

30. By 2019, Dodge/Ram pickups rose to the rank of eighth most stolen vehicle of any type or model year on the NCIB Hot Wheels Report, with 11,292 thefts reported. See **Exhibit 5**– NICB Hot Wheel Report (2019).

31. When looking at only recent models, the 2019 Ram pickup was the fifth most stolen vehicle, with 1,547 reported thefts per the 2019 NICB Hot Wheels Report. *Id.*

32. Dodge Ram full-size pickups in 2022 ranked eighth among all stolen vehicles in Michigan. See **Exhibit 6** – NICB Hot Wheel Report-Theft by State (2022).

33. In 2022, "about a half-dozen vehicles — primarily Dodge Ram TRX pickups — were taken from a lot outside an assembly plant in Macomb County." See **Exhibit 7**- "From Detroit to Ohio, auto theft ring exposed after armed robbery of a postal worker," PBS (Oct. 10, 2022), located at https://www.pbs.org/newshour/nation/from-detroit-to-ohio-auto-theft-ring-exposed-after-armed-robbery-of-a-postal-worker.

34. Vehicles target Dodge vehicles because of their ability to maintain speeds over 150 mph and out run patrol vehicles. *Id*.

35. After escaping with the Dodge vehicles, the criminals then used the vehicle's electronic On-Board Diagnostics ("OBD") system to reprogram a new key. *Id.*

36. Due to the ease of conducting a key fob relay attack, and programming new keys, Dodge Ram pickup models have continued to rank in the top ten most stolen vehicles in subsequent NICB Hot Wheels Reports.

37. The Class Vehicles have been, and are still being, targeted due to the Defect, which allows these Class Vehicles – which utilize keyless entry – to be easily unlocked and stolen without the security alarm being set off.

38. Upon information and belief, Defendants have known of the Vehicle Prone Defect and failed to prioritize advancing the security of the Class Vehicles.

39. NHTSA is required to periodically obtain and publish accurate and reliable theft data. 49 U.S.C. 33104(b)(4) (Designation of high theft vehicle lines and parts). The National Crime Information Center ("NCIC") of the Federal Bureau of Investigation provides this date to NHTSA. The NCIC is a governmental system that receives vehicle theft data from approximately 23,000 criminal justice agencies and other law enforcement authorities throughout the United States. This national data includes the reported thefts of self-insured and uninsured vehicles, not all of which are reported to other data sources.

40. In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares information with, automative manufacturers and their authorized representatives, about reported thefts, including the Defendants.

41. After heavy public scrutiny by customers, media, and politicians, and notice from NHTSA, Defendants acknowledged that the Class Vehicles are highly prone to theft, yet they have failed to admit that they suffer from the Theft Prone Defect, issue a safety recall, provide warranty coverage, or offer a complete remedy for the Theft Prone Defect in the Class Vehicles.

42. During the relevant class period, Defendants sold these Class Vehicles at multiple locations throughout the state of Michigan and the United States.

43. During the relevant class period, Defendants advertised the Class Vehicles online to the state of Michigan and the United States without disclosing the Theft Prone Defect.

44. Other automobile manufacturers, like Jaguar and Range Rover, have developed ultra-wide band protection to counter relay car theft, while Defendant remained silent and failed to act or even notify the public of the safety risks.

45. Defendants had the capability and means to add a fully functional anti-theft system, yet they failed to do so.

46. Plaintiff is further informed and believes that Defendant concealed and/or otherwise failed to disclose, reveal, or provide notice to customers, including Plaintiff and Class Members, in Defendant's advertising, labeling or otherwise that the Class Vehicles were, and still are, defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

47. Rather than address the Defect, Defendant has remained silent on the issue while thefts continue to soar.

48. As a long-time automotive manufacturer, which has conducted numerous customer surveys and fielded thousands of complaints and warranty claims from consumers, Defendants were aware that ordinary reasonable consumers generally expect defect-free automobiles when they make a substantial investment to purchase or lease.

49. Defendants could and should have informed Plaintiff and the Class of the Defect, rather than concealing it and/or failing to warn consumers about the risk of theft. Such information could have been provided through advertising and marketing campaigns; on-vehicle labeling,

stickers, and placards; owner manuals; brochures; pamphlets; dealership personnel and agents; the internet and social media outreach; and through full and complete disclosure through recalls.

50. Such information could easily have been made known to Plaintiff and the Class by Defendants before Plaintiff and the Class purchased their Class Vehicles, such as through their interactions with Defendants' dealership personnel and agents; all the various marketing and advertising Defendants undertake (including through television, internet, social media, sporting events, and other media); by looking at their vehicles, upon which Defendants could have affixed a warning about the Defect which Plaintiff would have necessarily seen by looking and sitting in the vehicle itself; and/or through the mail or email, as Defendants could have sent out—and indeed, regularly do send out—for the many recalls Defendants routinely issues each year.

51. Despite having knowledge of the Theft Prone Defect as detailed above—knowledge far superior to that of ordinary consumers such as Plaintiff and the Class—Defendant remained silent about the Theft Prone Defect for the Class Vehicles. As a result, the public—including prospective purchasers and lessors like Plaintiff and the Class—were unaware of the Theft Prone Defect at the time they purchased their Class Vehicles.

52. Defendant intended to mislead, and in fact misled, ordinary reasonable consumers—including Plaintiff and the Class—through its omissions, active concealment and/or failure to warn of the Theft Prone Defect. Defendant did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing its share of the automobile market and avoiding the expense of reprograming the key fob security systems.

53. As the 2021 Ram TRX "The Edge" commercial stated: "We will always go farther because that's what you demand. More power. Speed. Control. We design, engineer, and test, every part […] to raise their already high expectations."

54. The Class Vehicles have a diminished value compared to the price they commanded when purchased or leased by Plaintiff and the Class because disclosure of the Theft Prone Defect would influence the purchasing and leasing decisions of ordinary reasonable consumers, including their valuation and willingness to pay for the Class Vehicles.

55. Plaintiff and the Class lost money as a result of Defendants' conduct because they did not receive what they reasonably believed they were paying for due to Defendants' omission, active concealment, and/or failure to warn of the Theft Prone Defect, while Defendants realized a commensurate unearned gain because it did not deliver to Plaintiff and the Class what it reasonably expected to receive in exchange for the money it paid.

56. In effect, Plaintiff and the Class paid substantially more than the market value represented by the price bargained for, as Plaintiff and the Class bargained on a particular market value for their respective Class Vehicles. Because the Defendant's misconduct resulted in Plaintiff receiving less than they bargained for, Plaintiff and the Class effectively paid a higher price than that reflected in the market price.

57. The cost of every Class Vehicle would have been lower absent Defendant's concealment of the Defect and its related misconduct, and Plaintiff and the Class detrimentally altered their positions and suffered damages in an amount no less than the difference in value between what Plaintiff and the Class reasonably believed they were paying for and the value of the Class Vehicle they actually received.

58. The cost of every Class Vehicle would have been lower absent Defendant's concealment of the Defect and its related misconduct, and Plaintiff and the Class detrimentally altered their positions and suffered damages in an amount no less than

59. FCA operates the website www.dodgegarage.com ("Official Dodge Garage Website").

60. On August 12, 2021, the Official Dodge Garage Website published an article titled "Dodge Announces Three New Theft Protection Measures" ("August 12, 2021, Dodge Garage Article") See August 12, 2021, Dodge Garage Article, located at https://www.dodgegarage.com/news/article/showcase/2021/08/dodge-announces-three-new-theft-protection-measures.

61. The August 12, 2021, Dodge Garage Article states that "Since 2016, there have been around 6,000 Challengers and Chargers stolen in the United States [….] as thieves take advantage of vehicles with keyless entry and push-button starting systems." *Id.*

62. FCA acknowledged that "Naturally, this has created a great deal of anxiety for many […] car owners, but it has also put pressure on the folks from Dodge to help further protect against vehicle theft." *Id.*

63. On the Dodge Garage Website, FCA went on to explain "The Dodge Challenger, Charger and every other modern vehicle with keyless entry and push-button start relies on a key fob system. The key fob communicates via radio frequency with the vehicle whenever you push a button, but it also emits a constant signal that lets the car know that it is near or inside. Unfortunately, after smashing a window to gain access to the vehicle and its electrical system, thieves use a gadget to program a new key fob. Once this happens, they can unlock the doors, start the car and drive away as though they have your key. To battle this issue and other forms of theft, Dodge has come up with a trio of solutions." *Id.*

64. According to the August 12, 2021, Dodge Garage Article, "Dodge has developed three new security measures to help protect owners from having their vehicles stolen by thieves.

This includes the Enhanced Security Mode, Key Programming Lockdown and the Intrusion Module. The Enhanced Security Mode allows the owner to enter a 4-digit code to limit engine output to less than 3 horsepower, and it will be available Monday for the 2021 model year Challengers and Chargers. Key Programming Lockdown prevents thieves from programming new keys and it will be available for 2020 and 2021 models as early as October, but the company is committed to having the system in action by January 2022. After the 2020 and 2021 models are handled, Dodge will roll out the same software for 2015 through 2019 model years, with a new year being added every six weeks." *Id.*

65. For most Americans, the purchase or lease of a motor vehicle is their second largest financial transaction, following only the purchase or lease of a home. Had Plaintiff and other Class Members known of the Theft Prone Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

66. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff and members of the Classes, have suffered an ascertainable loss of money and/or property in the form of, for example, loss of value, loss of use of the vehicles, repair costs, insurance deductible costs, higher insurance premiums, lost time, and other inconvenience and anguish.

67. Plaintiff now brings this action on his own behalf and as representatives of a class of similarly situated persons who purchased and/or own a Class Vehicle that was manufactured, produced, distributed, and/or sold by Defendants to recover damages for violations of the Michigan Consumer Protection Act ("MCPA"), MCL §445.901, et seq., the Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., among other claims, for economic and injunctive relief against

Defendants which manufactured, designed, tested, distributed, promoted, and sold the Class Vehicles.

## PARTIES

68. Plaintiff is a resident and citizen of the state of Michigan. Plaintiff resides in Oakland County, in the Eastern District of Michigan.

69. On information and belief, Stellantis is engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or selling, either directly or indirectly, through third parties and/or related entities, the Class Vehicles.

70. On information and belief, FCA is a corporation duly organized and existing under the laws of the state of Delaware and duly authorized to conduct business in the State of Michigan.

71. On information and belief, FCA maintains its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

72. FCA is engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or selling, either directly or indirectly, through third parties and/or related entities, the Class Vehicles.

## GENERAL ALLEGATIONS

73. Plaintiff Wiater purchased a 2022 Dodge Ram TRX ("Class Vehicle") at Golling Chrysler Dodge Jeep Ram located at 2405 S. Telegraph Rd., Bloomfield Township, MI 48302 in Oakland County ("Dealership") for personal, family, or household use. Plaintiff's Class Vehicle had a keyless entry system.

74. Plaintiff was provided a keyless entry remote at the time of purchase. On information and belief, the Defendant Vehicle is a Class Vehicle subject to the Theft Prone Defect.

75. At the time Plaintiff purchased the Class Vehicle, Plaintiff was unaware that the vehicles were defective and that they were not fit for the ordinary purposes for which they are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

76. In April 2023, Plaintiff's Class Vehicle was stolen in broad daylight at approximately 2:00-3:00 pm EST on Long Lake and Crooks Road.

77. Plaintiff locked the Class Vehicle after exiting it.

78. Plaintiff had the key fob to the Class Vehicle with him at the time of the theft.

79. The unknown person(s) who stole the Class Vehicle activated the 'Keyless Enter 'n Go' system without Plaintiff's key fob.

80. The unknown person(s) who stole the Class Vehicle drove the Class Vehicle to a third location with Plaintiff's key fob.

81. The unknown person(s) who stole the Class Vehicle disabled the factory tracking system.

82. The only reason Plaintiff found the Class Vehicle was due to his Apple AirTag in the Class Vehicle.

83. Upon information and believe, the unknown person(s) held up a device at a distance from Plaintiff after he had exited his vehicle and gone into a business establishment to transmit the key fob's signal to a cloning device, which was subsequently used to trick the Class Vehicle into thinking the authentic key fob was nearby. This resulted in the unknown person(s) being able to gain entry and start the Class Vehicle without detection.

84. Indeed, the unknown person(s) who stole the Class Vehicle gained access without breaking any windows or setting off the alarm system.

85. Once the unknown person(s) gained entry and started the vehicle, they then accessed the OBDII port and connected a handheld device purchased online to tap into the car's computer system, program a new key fob, and drive off.

86. After recovering the Class Vehicle, Plaintiff took the Class Vehicle to the Dealership to repair it.

87. The Dealership took approximately a month to return the Class Vehicle to its original settings and condition.

88. The Dealership charged Plaintiff over $10,000 to repair the Class Vehicle.

89. Plaintiff's wife picked up Plaintiff's Class Vehicle from the Dealership.

90. When Plaintiff's wife picked up the Class Vehicle, Dealership employees told her not to park the Class Vehicle in public, including at the Costco parking lot adjacent to the dealership.

91. The Dealership employees explained the Plaintiff's wife how the Theft Prone Defect allowed a criminal to first use a key fob rely attack to enter the vehicle, turn it on, and then access the OBDII port and connect a handheld device purchased online to tap into the car's computer system, program a new key fob, and drive off.

92. The Plaintiff requested that the Dealership repair the Theft Prone Defect.

93. Dealership employees represented to Plaintiff's wife that the Theft Prone Defect cannot be repaired.

94. The mileage on the Class Vehicle was approximately 13,000 miles when it was stolen.

95. The Class Vehicle dropped in value by over $20,000 due to theft in April 2023.

96. Plaintiff listed the Class Vehicle on Carvana before the theft.

97. When Plaintiff listed the Class Vehicle on Carvana before the theft, Carvana priced the Class Vehicle at approximately $80,000.

98. After the Dealership returned the Class Vehicle approximately one month after the theft, Plaintiff listed the Class Vehicle on Carvana.

99. After Plaintiff updated the offer on Carvana to include the recent repairs and theft, Carvana lowered the value of the Defective Video by approximately $20,0000.

100. The mileage remained unchanged on the Class Vehicle in the Carvana offer.

101. Plaintiff pulled the Carfax report on the Class Vehicle after the theft.

102. The theft of the Class Vehicle appears in the Carfax report.

103. In order to prevent future thefts, Plaintiff must now take the main ignition fuse block out of the Class Vehicle when he parks it in a public space to prevent third-parties from bypassing the 'Keyless Enter 'n Go' system.

104. The design defect forced Plaintiff to either take a loss on resale value or continue driving the Class Vehicle while having to remove his main ignition fuse every time he leaves his vehicle.

105. Plaintiff purchased his Class Vehicle because he believed that the vehicle was safe, reliable, and high quality. Before purchasing the Class Vehicle, Plaintiff reviewed and relied on numerous statements and representations about it by the Defendants made through the Dealership, in addition to television commercials and other advertisements prior to Plaintiff's purchase of the Class Vehicle.

106. Defendants ran television commercials and other advertisements prior to Plaintiff's purchase of the Class Vehicle that touted, among other things, the safety, reliability, and quality of Dodge branded models.

107. Plaintiff saw these television commercials and other advertisements prior to Plaintiff's purchase of the Class Vehicle.

108. Mopar is a registered trademark of FCA.

109. The official Mopar YouTube account on September 30, 2020, published a video titled "Keyless Enter 'n Go | How To | 2021 Chrysler, Dodge, Jeep, Ram, Fiat & Alfa Romeo Vehicles." See YouTube, Mopar "Keyless Enter 'n Go | How To | 2021 Chrysler, Dodge, Jeep, Ram, Fiat & Alfa Romeo Vehicles" ("September 30, 2020, Mopar Video"), located at https://www.youtube.com/watch?v=_hRnoM7wVtM.

110. In the September 30, 2020, Mopar Video states: "To lock or unlock the vehicle, you'll need to have the key FOB within five feet or 1.5 meters away from the handle." *Id.*

111. The September 30, 2020, Mopar Video does not disclose the Theft Prone Defect or any other risk that the vehicles can be locked or unlocked without the key FOB within five feet or 1.5 meters away from the handle.

112. The official Mopar YouTube account on September 9, 2021, published a video titled "Keyless Enter 'n Go | How To | 2022 Chrysler, Dodge, Jeep, Ram, Fiat & Alfa Romeo Vehicles." See YouTube, Mopar "Keyless Enter 'n Go | How To | 2021 Chrysler, Dodge, Jeep, Ram, Fiat & Alfa Romeo Vehicles" ("September 9, 2021, Mopar Video"), located at https://www.youtube.com/watch?v=lMUSXEqgkjE.

113. In the September 9, 2021, Mopar Video states: "To lock or unlock the vehicle, you'll need to have the key FOB within five feet or 1.5 meters away from the handle." *Id.*

114. The September 9, 2021, Mopar Video does not disclose the Theft Prone Defect or any other risk that the vehicles can be locked or unlocked without the key FOB within five feet or 1.5 meters away from the handle.

115. Because Defendants failed to disclose the Theft Prone Defect, Plaintiff's research did not uncover that the Class Vehicle was affected by the Theft Prone Defect, and instead Defendants touted the Class Vehicle's safety, reliability, and quality.

116. After he purchased his new Class Vehicle, Plaintiff learned that his new 2022 Ram TRX was susceptible to the Theft Prone Defect.

117. As would a typical consumer, Plaintiff reasonably believed upon purchase that the Class Vehicle's security system, including the accompanying key fob and keyless entry system, would be fit for the ordinary purpose for which its security system was used, i.e., protecting the vehicle, and whatever was inside of it, from theft.

118. At no point before Plaintiff purchased his Class Vehicle did Defendants disclose it suffered from the Theft Prone Defect, which renders it highly susceptible and predisposed to theft by experienced and amateur thieves, and which makes it a prime target to be used instrumentalities through which thieves engaged in reckless driving and other criminal activity.

119. Defendants also did not include notice of the Theft Prone Defect in the Class Vehicle ownership manual, which would have allowed Plaintiff to take precautionary measures or dispose of the vehicle before the theft to mitigate any damages.

120. The Class Vehicle ownership manual contains no indication of the security flaw that allows the signal from the electronic key to be captured and relayed to a device that can unlock and start the vehicle.

121. Defendants concealed the existence of the Theft Prone Defect from consumers like Plaintiff.

122. For example, the commercial advertisement for the 2022 Dodge TRX pickup truck does not reference the Theft Prone Defect, or any other security risks.

123. Had Defendants disclosed the Theft Prone Defect before Plaintiff acquired the Class Vehicle, Plaintiff would have learned of the concealed information through, for example, the advertising channels described above or through discussions with the salesperson at the Dealership.

124. Plaintiff suffered an ascertainable loss as a result of the Defendants' wrongful conduct associated with the Theft Prone Defect.

125. The hackable key fob system on Plaintiff's Class Vehicle compromises the security of the vehicle, poses safety risks, and other inconveniences as described above, and otherwise impairs the utility and value of the vehicle.

126. Plaintiff did not receive the benefit of his bargain. Plaintiff purchased a vehicle that is of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality, design, safety, and reliable operation. The Theft Prone Defect has significantly diminished the value of Plaintiff's Class Vehicle.

127. Had Defendants disclosed the Theft Prone Defect, Plaintiff would not have purchased his Class Vehicle or would have paid less to do so.

128. Consequently, if ordinary reasonable consumers had known of the Theft Prone Defect, they naturally would consider it an important and material fact in deciding whether to purchase or lease a Class Vehicle and/or how much to pay for it.

129. Plaintiff notified Defendants of their breaches within a reasonable time of discovering the breach as required under MCL 440.2607(3)(a), including, but not limited to, filing a previous lawsuit with the same claims, *Wiater v. FCA US LLC et al* (4:23−cv−11408−SDK−APP) ("Prior Action").

130. Defendants did not raise any failure to provide notice pursuant to MCL 440.2607(3)(a) in the Prior Action.

131. Defendants' conduct has placed a target on owners of the Class Vehicles, such as Plaintiff, because a thief can easily identify a Dodge Ram TRX, or other Dodge vehicle, unlock it and steal it (which is exactly what happened to Plaintiff).

132. If an individual is lucky enough to retrieve their Class Vehicle after it is stolen due to the Theft Prone Defect, costs for repair can cost thousands of dollars. Not to mention increased insurance costs and the costs associated with finding alternative transportation.

**<u>CLASS ACTION ALLEGATIONS</u>**

133. Plaintiff brings this class action pursuant to Rule 23, Federal Rules of Civil Procedure, on behalf of himself and the following class of similarly situated persons:

a. A "Nationwide Class" based on claims of unjust enrichment, violations of the Magnuson Moss Warranty Act, and/or breach of express and/or implied warranty consisting of all customers who purchased any of the Class Vehicles in the United States within the past five years; or

b. A "Nationwide Class" based on claims of unjust enrichment, negligence, and design defect consisting of all consumers who own any of the Class Vehicles in the United States; or

c. A "Michigan Sub-Class" based on claims brought under the Michigan Consumer Protection Act ("MCPA"), and for unjust enrichment, and/or breach of implied and/or express warranty consisting of all persons who purchased any of the Class Vehicles in the state of Michigan for personal, family, business, or household purposes within the applicable statute of limitations period; or

d. A "Michigan Sub-Class" based on claims of unjust enrichment, negligence, and design defect consisting of all consumers who own any of the Class Vehicles in Michigan.

134. Excluded from each Class or Sub-Class are Defendants, including any parent, subsidiary, affiliate, or controlled person of Defendants; Defendants' officers, directors, agents, or employees; the judicial officers assigned to this litigation; and members of their staff and immediate families. Also excluded from the Class or Sub-Class are those claiming they have suffered a personal injury as result of the Class Vehicles, as well as residents of Wisconsin.

135. Each of the proposed Nationwide Class or Michigan Sub-Class meets all requirements for class certification. The Class or Sub-Classes satisfy the numerosity standards. The Class or Sub-Classes are believed to number in the thousands of people. As a result, joinder of all Class or Sub-Class Members in a single action is impracticable. Class or Sub-Class Members may be informed of the pendency of this Class Action by, among other methods, direct, published and/or broadcast notice.

136. There are questions of fact and law common to the Nationwide Class or Michigan Sub-Class which predominate over any questions affecting only individual members. The questions of law and fact common to the Class or Sub-Class arising from Defendants' actions include, without limitation, the following:

a. Whether Defendants continued to manufacture, market, distribute, and sell the Class Vehicles notwithstanding their knowledge of the defects' dangerous nature and risks of harm;

b. Whether Defendants knowingly omitted, suppressed, or concealed material facts about the unsafe and defective nature of the Class Vehicles from the consuming public;

c. Whether the Class Vehicles are fit for their ordinary purposes;

d. Whether the Class Vehicles proved reliable transportation;

e. Whether the Class Vehicles are safe;

f. Whether the Class Vehicles contain a design defect;

g. Whether Defendants' conduct violated the MCPA; and/or

h. Whether Defendants' conduct violated the Magnuson Moss Warranty Act.

137. The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity, to other available methods for the fair and efficient adjudication of this controversy.

138. A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class Members or Sub-Class Members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of Nationwide Class Members or Michigan Sub-Class Members to protect their interests.

139. The claims of Plaintiff are typical of the claims of members of the Nationwide Class and the Michigan Sub-Class. Upon information and belief, the Class Vehicles all share the same defects. Upon information and belief, the labels, manuals, advertising, and disclosures concerning the Class Vehicles all fail to reasonably disclose the presence of these defects. Therefore, the

information withheld by Defendants from Plaintiff and all Nationwide Class or Michigan Sub-Class members was identical.

140. Plaintiff is an adequate representative of the Nationwide Class and Michigan Sub-Class because he is a member of both Classes and his interests do not conflict with the interests of the members of the Nationwide Class or Michigan Sub-Class he seeks to represent. The interests of the members of the Nationwide Class or Michigan Sub-Class will be fairly and adequately protected by the Plaintiff and the undersigned counsel, who have extensive experience prosecuting complex class action litigation.

141. Plaintiff seeks a refund of some or all monies paid as a result of the purchase of the Class Vehicle that occurred following Defendants' wrongful and improper conduct in connection with the manufacture, marketing, distribution, testing, promotion, labeling and/or selling of the Class Vehicle.

142. Plaintiff, on behalf of himself and the putative class, further seeks injunctive relief, enjoining Defendants from selling the Class Vehicles, and requiring Defendants to fix the defect.

143. Plaintiff specifically excludes from this class action any damages, losses, or other relief of any kind arising from the personal injuries suffered by those class members personally injured by the Class Vehicle based on the defects.

144. Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each member of the Nationwide Class or Michigan Sub-Class who suffered harm to bring a separate action given the damages at issue compared to the costs of litigating each individual claim. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts

and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Nationwide Class Members or Michigan Sub-Class Members.

145. Class action treatment of the claims in this action is the superior method of resolution with respect to concerns of efficiency, fairness, and equity over other available methods of adjudication.

146. Class action treatment is appropriate in this case because Defendants acted, or refused to act, in a manner that was generally applicable to – and often identical to – each member of the Nationwide Class or Sub-Class. Defendants provided the Class Vehicles with the same defect to, and withheld the same information from, all members of the Nationwide Class or Michigan Sub-Class and sold the Class Vehicles with the same defects.

147. Notice can be provided to Class Members or Sub-Class Members by using techniques and forms of notice similar to those customarily used in other defective-product cases and complex class actions.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MCPA) – MCL §445.901 ET. SEQ.

148. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

149. Plaintiff brings this Count against Defendants on behalf of all members of the Michigan Sub-Class.

150. The transaction involved in this case falls within the Michigan Consumer Protection Act (MCPA) MCL 445.901 et. seq.

151. The conduct of Defendants as described above violates the following sections of the MCPA: MCL 445.903(1)(e), MCL 445.903(1)(s), MCL 445.903(1)(y), MCL 445.903(1)(bb) and MCL 445.903(y)(cc).

152. Defendants breached the MCPA and are therefore liable to Plaintiff and the Class.

153. Defendants knew or should have known that the Class Vehicles lacked functional anti-theft systems, among other design failures, and that they were failing to disclose this material fact, thereby misrepresenting the safety, ease of theft, and value of the Class Vehicles.

154. Defendants failed to disclose the defects to Plaintiff and the other Class members even though Defendants were aware or should have been aware of the defects.

155. As a result of Defendants' violation of the MCPA, Plaintiff has suffered actual damages.

## COUNT II – VIOLATION OF THE MAGNUSON MOSS WARRANTY ACT

156. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

157. Plaintiff brings this Count against Defendants on behalf of members of the Nationwide Consumer Class.

158. This Court has jurisdiction to decide claims brought under 15 U.S.C. §2301 by virtue of 28 U.S.C. § 1332(a)-(d).

159. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

160. Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

161. Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

162. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

163. Defendants provided Plaintiff and the other Class members with an implied warranty of merchantability in connection with the purchase of their Class Vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

164. As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for the ordinary purpose of passenger motor vehicles, were not far easier to steal than other vehicles, and were not unsafe and/or unreliable due to the ease at which they can be stolen.

165. Defendants breached this implied warranty and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1) because, without limitation, the Class Vehicles share common design defects, including that they are incredibly susceptible to theft.

166. These defects render the Class Vehicles deficient, in that they do not provide safe and reliable transportation, as they are tremendously easy to steal.

167. A vehicle that has been stolen, or can be too easily stolen, is neither safe nor reliable.

168. Defendants provided Plaintiff and the other Class members with an express written warranty in connection with the purchase or lease of their Class Vehicles, as described further below, that is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

169. Defendants made written affirmations of fact that the Class Vehicles would be free of defects that would prevent ordinary use.

170. Upon information and belief, Defendants affixed labeling and other written affirmations making specific, performance-related representations related to the nature of the Class Vehicles, including expressly warranting that the Class Vehicles were high quality, properly

designed, in conformance with applicable federal standards, and at a minimum, would work properly.

171. Defendants breached their express warranties for the Class Vehicles by, among other things, selling or leasing to Class members Class Vehicles that are defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

172. Any efforts to limit the express and implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void. Any limitations on the express and implied warranties are procedurally unconscionable. Defendants purposefully misrepresented the Class Vehicles to consumers.

173. Additionally, there was unequal bargaining power between Defendants, on the one hand, and Plaintiff and the other Class members, on the other.

174. Any limitations on the express and implied warranties are substantively unconscionable.

175. Defendants knew or should have known that the Class Vehicles lacked functional anti-theft systems, among other design failures, and that they were failing to disclose this material fact, thereby misrepresenting the safety, ease of theft, and value of the Class Vehicles.

176. Defendants failed to disclose the defects to Plaintiff and the other Class members even though Defendants were aware of the defects.

177. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers and agents.

178. Specifically, Plaintiff and each of the other Class members are intended third-party beneficiaries of the implied and written warranties.

179. The dealers and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided for the Class Vehicles: the warranty agreements were designed for and intended to benefit consumers.

180. Finally, privity is also not required because the Class Vehicles are unsafe and hazardous instrumentalities due to, among other matters, the lack of functional anti-theft systems.

181. Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

182. Furthermore, affording Defendants an opportunity to cure their breach of warranties would be unnecessary and futile.

183. At the time of sale or lease of each Class Vehicle, the Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.

184. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff resorts to an informal dispute resolution procedure and affords Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

185. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.

186. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

187. Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including, but not limited to, diminution in the value of their Class Vehicles, in an amount to be proven at trial.

188. In addition to the monetary harms that they have suffered, Plaintiff and the Class Members have experienced non-economic damages, including, but not limited to, being deprived of their peace of mind because of the constant fear of being victimized by car theft.

189. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class members in connection with the commencement and prosecution of this action.

190. Additionally, Plaintiff and each of the other Class members are entitled to equitable relief under 15 U.S.C. § 2310(d)(1), including the expense associated with Defendants being required to fix the Class Vehicles.

**COUNT III - UNJUST ENRICHMENT**

191. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

192. Plaintiff and the Nationwide Class and/or Michigan Sub-Class members purchased Class Vehicles that they would not have purchased had they known that the Class Vehicles are defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

193. The Defendants were therefore unjustly enriched at the expense of and to the detriment of the Plaintiff and the Class.

194. Plaintiff and the Nationwide Class and/or Michigan Sub-Class are therefore entitled to restitution from the Defendants and seek an order requiring the Defendants to disgorge all profits, benefits, and other compensation that Defendants obtained from the sale of these products.

**COUNT IV – BREACH OF IMPLIED WARRANTY**

195. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

196. Defendants are merchants with respect to the sale of the Class Vehicles purchased by Plaintiff.

197. Defendants, by selling the Class Vehicles, impliedly warranted that the Class Vehicles were merchantable with respect to goods of that kind.

198. The Class Vehicles sold by Defendants and purchased by Plaintiff did not conform with the implied promises made with respect to the labels and material that accompanied the product. Specifically, by failing to reasonably disclose that the Class Vehicles did not have functional anti-theft systems, Defendants implied that the Class Vehicles were not far easier to steal than other vehicles, were thereby safe, and were worth as much as vehicles that possessed functional anti-theft systems.

199. As a result of having no functional anti-theft systems, among other defects, the Class Vehicles were not merchantable, and Defendants breached their implied warranty of merchantability with respect to the Class Vehicles.

200. Had Plaintiff known that the Class Vehicles lacked a functional anti-theft system, among other defects, making them far easier to steal, and were thereby unsafe and worth less than their sales price, he would not have purchased it or would have paid significantly less for the

vehicle. As a result of Defendants' breach of implied warranty, Plaintiff and the Nationwide Class and/or Michigan Sub-Class members have suffered economic injuries.

201. Defendants are being provided notice by receipt of demand made by Plaintiff on behalf of themselves and the putative class through the filing of this Complaint. In addition, Defendants have actual notice of the defect.

WHEREFORE, Plaintiff prays for judgment against Defendants for actual damages, in excess of the jurisdictional limit and as determined at trial, for the costs of this action, and for such further relief as the Court deems fair and reasonable.

**COUNT V – BREACH OF EXPRESS WARRANTY**

202. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

203. Defendants are and at all relevant times were merchants with respect to motor vehicles under U.C.C. § 2-313.

204. Upon information and belief, in the course of selling its Class Vehicles, Defendants expressly warranted in writing that the Class Vehicles were high quality, properly designed, in conformance with applicable federal standards, and at a minimum, would work properly.

205. Defendants breached their express warranties for the Class Vehicles by, among other things, selling or leasing to Class members Class Vehicles that are defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

206. Due to the Defendants' breach of warranties as set forth herein, Plaintiff and the Class assert as an additional and/or alternative remedy, as set forth in U.C.C. §§ 2-608 and 2-711, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the Class of the

purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under U.C.C. §§ 2-608 and 2-711.

207. Defendants were provided notice of these issues, upon information and belief, by numerous communications sent by customers before or within a reasonable amount of time after the allegations of vehicle defects became public.

208. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the Class have been damaged in an amount to be determined at trial.

## COUNT VI – NEGLIGENCE

209. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

210. Defendants designed, manufactured, distributed, tested, sold, applied, used and/or supplied the Class Vehicles at issue.

211. Defendants held themselves out as a corporation capable of reasonably and prudently developing, manufacturing, marketing, supplying, testing, distributing, using, and selling the Class Vehicles at issue and therefore had the duty to have and exercise the knowledge of an expert on such product.

212. Defendants knew or should have known that the Class Vehicles contained defects including that, among other things, Defendants manufactured and designed them without functional anti-theft systems.

213. As designers, manufacturers, processors, packagers, distributors, marketers, sellers, users, appliers and suppliers of the Class Vehicles, Defendants had a duty to:

a. Exercise due care and the ordinary, reasonable and technical skill and competence that is required of designers, manufacturers, processors, packagers, distributors, marketers, sellers, suppliers, and others in a similar situation,

including, without limitation, the duty to test its vehicles; the duty to acquire and maintain the knowledge of an expert;

b. Design, manufacture, process, distribute, market, sell, and/or supply its vehicles free from defects and/or latent defects;

c. Adequately warn consumers of vehicle defects and/or hazards, which duty continued even after the sale of Class Vehicles.

d. Market, advertise, sell and supply vehicles with adequate information and warnings about the unacceptable risk of theft their design failures create.

214. Defendants failed to use due care under the circumstances and thereby breached their duties as set forth above and were careless and negligent in the performance of its said duties to Plaintiff and the Nationwide Class and/or Michigan Sub-Class members.

215. Plaintiff used these Class Vehicles in a manner ordinarily anticipated by Defendant.

216. As a direct and proximate result of the dangerous and defective condition of the Class Vehicles and Defendants' failure to warn of the dangers thereof, Plaintiff and the Nationwide Class and/or Michigan Sub-Class members have suffered economic injuries.

217. These injuries are not limited to only the difference in value between a Class Vehicle and a similar vehicle that is not defective. Other damages include, but are not limited to, the increase in insurance premiums that Plaintiff and Class members are facing or may face due to the design defect, and the stigma associated with owning or possessing the Class Vehicles.

218. At the time of Defendants' design, manufacture, processing, distribution, marketing, selling, supplying and/or use of the Class Vehicles at issue, Defendants knew of the dangerous condition of said products and supplied them with deliberate and/or intentional disregard for not making any warning, instruction, or other precaution to prevent injuries or

damages and thereby showed complete indifference to and/or conscious disregard for the rights and/or safety of others.

219. Defendants specifically placed profits ahead of the health, rights, and safety of others by concealing material facts about the Class Vehicles.

220. Defendants' conduct of concealing material facts was negligent and negatively impacted the rights of Plaintiff and the Nationwide Class and/or Michigan Sub-Class members.

221. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have been damaged in an amount to be determined at trial.

## COUNT VII – STRICT LIABILITY, DESIGN DEFECT

222. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

223. Defendants designed, manufactured, and/or supplied the Class Vehicles in question within the ordinary course of their business.

224. Plaintiff purchased and owned a Class Vehicle.

225. The Class Vehicles contain a design defect including that, among other things, Defendants manufactured and designed them without functional anti-theft systems. As a result, the Class Vehicles are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than if they were not defective.

226. Defendants knew or should have known of the dangerous and defective nature of the Class Vehicles at the time of their design, manufacture, sale, testing, transportation, distribution, supply, and use.

227. Notwithstanding, Defendants failed to take safety precautions to prevent economic injury to Plaintiff and failed to warn and/or instruct Plaintiff and others of the defective and unreasonably dangerous nature of Class Vehicles.

228. Defendants' unreasonably dangerous Class Vehicles directly and proximately caused economic injuries to Plaintiff and the Nationwide Class and/or Michigan Sub-Class members.

229. Plaintiff drives his vehicle, then parks and leaves the vehicle unattended, which is a manner of use reasonably anticipated by Defendants.

230. As a result of the Class Vehicles' defect, which makes them incredibly easy to steal, they are unreasonably dangerous and defective when put to the use anticipated by Defendants.

231. As a direct and proximate result of the dangerous and defective condition of Defendants' Class Vehicles and Defendants' failure to warn consumers of the dangers thereof, Plaintiff and the Nationwide Class and/or Michigan Sub-Class members have suffered economic injuries.

232. These injuries are not limited to only the difference in value between a Class Vehicle and a similar vehicle that is not defective. Other damages include, but are not limited to, the increase in insurance premiums Plaintiff and Class member are facing or may face due to the design defect, and the stigma associated with owning or possessing the Class Vehicles.

233. At the time of Defendants' design, manufacture, processing, distribution, marketing, selling, supplying and/or use of the Class Vehicles at issue, Defendants knew or should have known of the dangerous condition of the Class Vehicles and supplied them without making any warning, instruction, or other precaution to prevent injuries or damages and thereby showed complete indifference to and/or conscious disregard for the rights and safety of others.

234. Defendants specifically placed profits ahead of the health, rights, and safety of others by concealing material facts about the Class Vehicles.

235. The Class Vehicles were unreasonably unsafe or unreasonably dangerous when they were designed, manufactured, and/or sold.

236. Defendants expected and intended that the product would reach consumers without changes.

237. Plaintiff suffered damages as a result of purchasing the Class Vehicle.

238. At the time of Defendants' design, manufacture, processing, distribution, sale and/or use of the Class Vehicle, Defendants knew or should have known of the dangerous condition of the Class Vehicles and supplied them without making any warning, instruction, or other precaution to prevent injuries and thereby showed complete indifference to and/or conscious disregard for the safety of others. Defendants specifically placed profits ahead of the health and safety of others by concealing material facts about the Class Vehicles' safety features.

## COUNT VIII – FRAUDULENT CONCEALMENT

239. Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

240. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to their customers the true nature of the Defect which was not readily discoverable by them until after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

241. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

242. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the Class members. These omitted facts were material because they directly impact the safety of the Class Vehicles.

243. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class members. Defendants also possessed exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

244. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

245. Plaintiff and the Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the Class members were justified.

246. Plaintiff and the Class members reasonably relied on these omissions and suffered damages as a result.

247. As a result of the concealment and/or suppression of the facts, Plaintiff and the Class members sustained damage. For those Class members who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiff and the Class members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those who want to rescind the

purchase, they are entitled to restitution and consequential damages. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights and well-being of Plaintiff and the Class members in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendants as follows:

a. That the Court enter an order certifying the Class, appointing Plaintiff as representative of the Nationwide Class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Rule 23, be given to the Nationwide Class;

b. Alternatively, that the Court enter an order certifying the Michigan Sub-Class, appointing Plaintiff as representative of the Michigan Sub-Class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Rule 23, be given to the Michigan Sub-Class;

c. For a judgment against Defendants for the causes of action alleged against Defendants;

d. For damages in an amount to be proven at trial;

e. For appropriate injunctive relief, enjoining the Defendants from selling the Class Vehicles and ordering them to fix or replace the Class Vehicles;

f. For attorneys' fees;

g. For Plaintiff's costs incurred; and

h. For such other relief in law or equity as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and class members similarly situated hereby demand a trial by jury.

Respectfully Submitted,

Dated: June 3, 2026

*/s/ Cassandra M. Kirsch*

**YATOOMA LAW, P.C.**
Cassandra Kirsch (P88342
2200 Hunt Street, Suite 2050
Detroit, MI 48207
(248) 481-2000
ckirsch@normanyatooma.com